FILED FEB 18 3 21 PM '04

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| EVELINE GOINS | : | CIVIL ACTION NO. 3:02 CV 1069 (MRK) |
| vs. | : | |
| JBC & ASSOCIATES, P.C.<br>JACK H. BOYAJIAN<br>MARVIN BRANDON | : | FEBRUARY 17, 2004 |

**AFFIDAVIT IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGEMENT**

I, Sabato F. Fiano, do hereby state:

1. I am over the age of eighteen and believe in the obligations of an oath.

2. I make this affidavit in support of the Defendants' Opposition to the Plaintiff's Motion for Summary Judgment in the above action.

3. I am appearing counsel for above-named defendants in this action.

4. Attached hereto are true copies of transcript excerpts of the deposition of the defendant Jack Boyajian, which deposition was taken in this action on January 27, 2004.

5. Attached hereto is a true copy of Exhibit G from the deposition of the defendant Jack Boyajian and the deposition of the defendant Marvin Brandon, which deposition was taken in this action on September 5, 2003.

6. Attached hereto is a true copy of the Defendants' sworn response to Plaintiff's interrogatory number 4 in this action.

Sabato P. Fiano

Subscribed and Sworn to
this 17th day of February 2004

~~Notary Public~~ Commissioner of Superior Court

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT
---------------------------------x
EVELINE GOINS,
Plaintiff,
-versus- : Case No. 3:02CV 1069 (MRK)

JBC & ASSOCIATES, ET AL,

Defendants.

---------------------------------x

Deposition of JACK H. BOYAJIAN, taken pursuant to The Federal Rules of Civil Procedure, at the offices of Sanders, Gale & Russell, 437 Orange Street, New Haven, Connecticut, before Patricia Saya, LSR No. 37, a Registered Professional Reporter and Notary Public in and for the State of Connecticut, on January 27, 2004, at 10:35 a.m.

A P P E A R A N C E S:

For the Plaintiff:
JOANNE S. FAULKNER, ESQ.
123 Avon Street
New Haven, Connecticut 06511-2422

For the Defendants:
KLEBAN & SAMOR, P.C.
2425 Post Road
Southport, Connecticut 06890
By: SABATO P. FIANO, ESQ.

S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED by and between counsel for the respective parties hereto that all technicalities as to proof of the official character before whom the deposition is to be taken are waived.

IT IS FURTHER STIPULATED AND AGREED by and between counsel for the respective parties hereto that the signing of the deposition by the deponent may be performed before any Notary Public.

IT IS FURTHER STIPULATED AND AGREED by and between counsel for the respective parties hereto that all objections, except as to form, are reserved to the time of trial.

* * * * * *

GOINS v. JBC January 27, 2004
Page 4

INDEX

| WITNESS | DIRECT | CROSS |
|---|---|---|
| JACK H. BOYAJIAN | 5 | -- |

PLAINTIFF'S EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| L | Fact Sheet, one page | 5 |
| M | Press Releases | 53 |
| N | Letter dated November 22, 2001 | 76 |

(Exhibits were retained by counsel.)

SANDERS, GALE & RUSSELL (203) 624-4157

The "R00" may also be something that I use as part of the process of actually initiating the letter. The rest are not. "MB" is for the second page of G.

Q. Can you tell what Brandon did on the second page of G?

A. He changed the status to 31.

Q. And what does that mean?

A. No. He changed the status to 49 from 31.

Q. What is status 31?

A. I don't remember. I think it is legal review for legal process, I believe. And 49 is closed per attorney. That is what appears on the first page of G.

Q. On the first page of G, it says "date last." What does that mean?

A. "Date last," I don't know. That could be date last -- it should be the date of the check, but I think for the conversion purposes, because it was brought over from GWA, it was the date received in the GWA system, I believe.

Q. On 6/24, when Mr. Brandon changed the status, there is an old 20 lines or so ending with "DMP." What does that mean?

A. Those were the accounts that were consolidated into those master, Miss Faulkner. These were accounts that were not part of this master, and they were merged,

and that is how this account went from having four checks to having 25 checks.

Q. And where do you see four checks?

A. I don't. I know by reviewing with my office this morning that previous to that consolidation with those mergers, there were four checks on this account.

Q. To Wilson Suede & Leather?

A. I don't know. I can find out for you. But the two were to Wilson Suede & Leather, Check Numbers 287 and 189, but there was also two other checks, Check Number 186 and 292, written on January 28, 1996, and January 26, 1996, for 178.95 and 354.17 respectively.

Q. Those were also written to Wilson?

A. I have to check, but I think they may have been, yes. I am pretty sure they were. I can't be very certain, but I will try to get that information.

Q. Is Wilson any relation to Melville?

A. They owned it. Melville owned it at one time.

Q. Melville owned it at one time?

A. Yes. They continue to service the checks after they sold it.

Q. How about CVS?

A. They own CVS.

Q. Who owns CVS?

A. Melville.

Q. What about Marshall's?
A. They owned that too, at one time.
Q. Melville owned it at one time?
A. Yes.
Q. And when did they stop owning Wilson?
A. I don't know. I don't know when they sold it, but they kept the servicing of these returned checks as part of their deal.
Q. Who were the other entities that may be listed on page 2 of Exhibit G?
A. Foot Action is "FTA."
Q. I'm sorry?
A. Foot Action. "K" is KV Toys. "Bob" is Bob's Stores, and "Maral" is Marshall's. "Toys" is Toys 'R Us. It has nothing to do with Melville. That is on page 3.
Q. So Toys is the only one of all these that has nothing to do with Melville?
A. Apparently.
Q. Did Melville own Bob's?
A. Yes.
Q. Is there any way the account would be opened after Brandon said it had to be closed?
A. Yes.
Q. How would that happen?

that I can -- that would reflect that fact, yes.
Q. Where would you look?
A. In different screens.
Q. What would the screens tell you?
A. The fact that the face value of the check was $243.79 and the service fee of $25 was added to it.
Q. Would that service fee be included in the collection letter?
A. The first collection letter, it would state that, yes.
Q. First collection letter would say 243 plus 25?
A. Yes. There is a grid that is presented on the first letter.
Q. Turn to Exhibit B. Is that the sample first letter?
A. Appears that way, yes, but in this case, $20 is being used because I think subsequent to that letter, the statute either changed or we interpreted it differently, so we are now adding $20 and not 25 per check.
Q. So as of this letter of September 23, 2002, you were adding a return charge of 25; is that correct?
A. No, 20. September 5th, September 5th.
Q. Exhibit B --
A. Right.

Q. -- is a letter dated September 23, 2002.

A. Right. It looks like a real letter that went to a real person, okay.

Q. Is that correct?

A. I am not sure, but I assume so.

Q. Under "Return charge," it says "$25"?

A. Yes, but I think that that is incorrectly typed, and if you look at the face of the letter, the second full paragraph, it clearly states it is $20.

Q. On the upper left of Exhibit B, there is a number above the bar codes, which end in "CT." Does that indicate that this is one of the letters that JBC uses in Connecticut?

A. Yes. It would reflect that this was the first letter that goes out for a bad check writer, that the transaction was in Connecticut.

Q. How can you tell it was the first letter?

A. Because there is a "001" in front of the "CT."

Q. Plaintiff's Exhibit C is another letter also dated September 23. Is that the second letter that goes into Connecticut --

A. It could be.

Q. -- as of September 23?

A. It could be.

Q. If you look down at the bottom, there is a

very, very -- "2 CT"?

A. Yes.

Q. Are you still using the sample letters in Connecticut, B and C?

A. I have answered what question. I do not know if there are letters going to Connecticut right now. You asked me that question before.

Q. I asked you -- I didn't ask you whether you were using these letters.

A. And I wouldn't know either case. I am not sure if these letters have changed since September 23rd, 2002.

Q. Were there more than two letters, two forms of letters, going into Connecticut in September, 2002?

A. There could have been, yes.

Q. Do you have those stored on your system someplace?

A. Unless they were deleted, they would still be there, yes.

Q. Would you have your sample letters from November, 2001, in your system?

A. I doubt it, but it is possible. No, it is possible. It should still be there.

Q. I did ask for that in discovery, and I would like it, please.

A. They may be the same as these though, so you might have gotten the response that you were looking for. In other words, if nothing changed between November 1st of 2001 and September 23rd of 2002, then you received what you asked for.

Q. But if something did change, I did not receive what I asked for?

A. That's right. What I am saying is that at the time that we may have been responsive to your document production, it would have given us an opportunity to make those comparisons, whereas I don't have that ability today to do that. So the response you received is probably in my mind more accurate than my testimony here today specifically relating to these two letters.

Q. But if there is a difference, you will go back in your machine?

A. If that is your request, it will be a new request, and I will be able to address that. What I am saying is we may have already addressed -- I don't want the court record to appear as if we were agreeing that we were non-responsive because we could have been very much responsive. It is just you are asking a new question that I can't answer.

Q. The record will show that it is the same question that we asked in discovery.

MR. FIANO: I will say this for the record. We will go back into our system, and if there were some letters in November of 2001 that were somehow different than what we have already disclosed, then we will definitely provide copies of any sample letters in November, 2001, that were different than what has been disclosed thus far.

I think Mr. Boyajian will say that he thinks at the time, that comparison might have occurred already, and that was produced as responsive, as these letters being the same -- being essentially the same in content as anything on their system that might have been in place in November, 2001.

Q. What procedures have you had in place in and since November, 2001, to make sure that the right amount goes into the letter, right dollar amount, that is owed by the debtor?

A. When we converted our information systems to the CRS Software, they did not have a state by state ability to place a check fee amount automatically. We have to design that into the system. And after several series of errors and programming errors that we have discovered slowly, over time, I think we are now confident that we have properly identified the service fees that are related to each such check, or non-check,

for that matter, if there is any additional fees that need to be added under the law.

Q. Who is this CRS Software made by?

A. CRS Software? They are a company.

Q. That is the name of the company?

A. Yes.

Q. Isn't that a widely used collection software?

A. I don't know who their customer base is. I know that when I was reviewing it, they were used by a large number of people who don't necessarily collect on bad checks but collect on other types of debts.

Q. What safeguards do you have to make sure that, for instance, a letter is sent out on the account, which is Exhibit G, only includes the 243 plus the 25, or the 20, as the case may be?

A. I think I have answered that question. Are you asking any additional safeguards other than the ones I have identified?

Q. Yes.

A. None that I can recall, none that I thought was necessary at the time.

Q. Do you know what the statute of limitations on bounced checks is in Connecticut?

A. I believe it is six years under contract law, and I also believe that it is not a bar to either a

collection effort or litigation.

Q. Do you know what the criminal statute of limitations on a bounced check is?

A. I believe an untold statute of limitations is -- I believe it is two years over a certain sum. I don't remember the exact statute.

Q. Who is James Carty?

A. I don't know who that is.

(Plaintiff's Exhibit N: Marked for Identification - described in Index.)

Q. Would you look at Exhibit N, please, and tell me what that is?

A. It is a letter directed to the plaintiff, dated November 26, 2001, from JBC & Associates, PC.

Q. Down at the bottom left-hand corner, there is a code. Can you tell me what that code might be?

A. No, I don't know what that code is.

Q. Looks like a printer code to me. Up at the top, above my client's name, there is a series of numbers. What do those mean?

A. The first six digits, I believe, is the master account number, which is the file number. And I have no idea what the other numbers mean.

Q. "- 3," would that indicate a third letter?

A. No, but this could be a third letter. It

could be a fourth letter. It is certainly not the first letter.

Q. How did the balance on the Wilson Suede & Leather account get to $1,971.80?

A. Well, this is a letter that is unlike the first letter, which has the details of more than one check. This letter is master-driven, which means it picks up the first client name on the first debt. So in this case, I believe the first debt on the system for this particular master number was the one written to Wilson Suede & Leather for $243.79, dated January 29th, 1996, Check Number 297.

The amount represents four checks at the time that was on this account, on this master account, before the consolidation that happened in June of '02. And I have already identified, besides the two that you have identified, as counsel for plaintiff in various summary motions and other documents you have presented to the court, that there were two other checks; namely, one, the check numbers that I gave, and those amounts, the face amounts, was 178.95 and 354.17. That is 17 cents, and I believe that that 1,971.80, if you do the calculations, would be the face value of all those four checks, plus a service fee of $25 per check, plus damages equal to the face value of each of those checks,

would total that 1,971.80.

Q. So your sworn statement under oath in discovery that there were only two checks was false?

A. I think there was a -- because of the system inaccuracies and incompetencies, we assumed that there were two checks, and there were actually four that related to this letter dated November 22nd, 2001. It was not an intentional attempt to not be responsive. It was just simply an error.

Q. Your office sent out another letter about a year later, claiming that the balance was $10,000?

A. Right, and that is because on June 24th, we discovered --

MR. FIANO: I am just going to state something for the record right now. The letter you are about to start talking about is the subject of a third and separate action. I don't have -- I don't have an issue with talking about that letter today, even though it is the subject of a separate action, but then at the same time, I also don't expect that Mr. Boyajian's deposition is going to be noticed in that action, to start talking about that letter again, if we are going to get into it today, I guess is what I am saying.

MS. FAULKNER: Well, your expectation is wrong because I expected to have all the discovery

A. No. I think the request is to call in so that we can confirm the license, but we don't necessarily place the license number on the check -- on the letter.

Q. And once again, I think I have asked in discovery and I asked Mr. Brandon, is there a driver's license number associated with this check?

A. I think it is. Isn't it provided for you?

Q. Exhibit G?

A. No. How about Exhibit F?

Q. That is the driver's license number?

A. The CT 212, yes.

Q. It is the only driver's license number that you had?

A. For those checks, yes, apparently. I can try to confirm that, but I see no reason why it is wrong. Is that your client's driver's license number?

Q. Is this an effort to collect a debt?

A. You are saying we didn't give you one, and we did.

Q. Now, your second to the last sentence says, "We reserve the right to use any and all information we have obtained in further civil or criminal proceedings."

What criminal proceedings has JBC initiated in Connecticut?

A. Well, it doesn't have to be Connecticut only.

This letter is a letter that is sent to more than just Connecticut, and if in fact this letter went to someone who bounced a check, for example, on JBC, which sometimes that occurs, and quite often it occurs, we proceed with criminal action. And we have brought criminal action against Connecticut residents in New Jersey, and we have summoned them into court. So yes, we do bring criminal action against Connecticut residents.

MS. FAULKNER: We are not going to finish in 10 minutes.

(Lunch Recess: 1:00 to 1:40 p.m.)

Q. We were talking about Exhibit N, the letter of November 22, 2001.

A. Yes.

Q. At the date of this letter -- I think you said you knew the checks had been issued in '96, was it?

A. Yes.

Q. So was there any ability at that point to use the old checks in some criminal proceedings?

A. Well, that I believe requires a conclusion that I am not prepared to make. I think it is a matter of interpretation and law, but I believe that what we are reserving here was just simply the right to use the information in civil or criminal proceedings, so I think

your question is related to specifically the dates of those checks and whether or not they would be subject to civil or criminal proceedings. But what we were simply doing is they are reserving the right to do so.

Q. But you didn't have a right to reserve at that point as far as criminal proceedings; isn't that correct?

A. I am not sure about that. I think that is a conclusion of law that neither one of us can really rightfully make. If your client wrote another bad check in that interim period of time, I think that would definitely be relevant.

Q. To what?

A. Whatever. I mean, I have a theory of law that may not be yours, and that may -- I am not necessarily prepared to tell you, but I think there is no question that there would be a basis for using her pattern of writing bad checks, and many of them, not just a few.

Q. These were all NSF checks, as far as you know?

A. I don't know what you mean by "NSF." They are non-sufficient funds versus stop payments?

Q. Right.

A. I believe they are all insufficient funds, reasons for returns.

Q. Is there something on Exhibit G that would

tell you that?

A. Not in this particular exhibit, but if the client identified -- normally our clients identify stop payment as differently than an account closed or a non-sufficient fund issue. We take note of those, and we handle them differently.

Q. So these are handled as though they were NS, non-sufficient funds checks?

A. Or account closed.

Q. Or account closed, and how can you tell whether there was an account closed?

A. Well, if the client does not advise us to stop payment, then we assume that it is either/or, and we treat them the same.

Q. The first line of the Exhibit N, you say that my client has refused an offer to voluntarily make restitution. When did that occur?

A. Well, this would be a third or fourth letter. The first two letters that we provided in the responsive pleadings are letters that -- or some version of those letters would have gone to your client prior to this letter being sent. And the notation on our system shows that she outright refused -- in speaking to 618, as reflected in Exhibit G, she outright refused to make payment.

Q. Where on Exhibit G does it show that any prior letter or communication was made with my client?

A. That would be in the GWA system, not in this system.

Q. And once again, you haven't provided me with a GWA system?

A. That is because we don't have it. I am pretty confident that those -- some were retained, and if it was retained, we would have provided it to you, but I will double-check on that. That server was -- once the information was transferred, the server was no longer maintained.

Q. If you will look at Exhibit E for a moment, the status closed is a 42 instead of a 49. Does that make any difference?

A. E 2?

Q. Exhibit E?

A. Exhibit E?

Q. Status is 42.

A. Well, I think this was subsequent to an inadvertent consolidation that occurred on this account, and I guess when it was closed a second time, because it reopened itself. And we closed it a second time to 42 instead of 49. The first time it was closed to 49 by Marv Brandon upon, I believe, either the first action

# FACT SHEET

CRS #: 562183
Name: GOINS, EVELINE J
Address: 45 3RD ST
City/State: NEW HAVEN, CT 06519-2715
Phone #1: (203) 562-6153
Phone #2: (0 ) -
Soc Sec No: 129-02-19
Contact:

Client #: WSU -1
WILSON SUEDE & LEATHER
Acct #: 4948180-297
Regarding:
Amt Refered: 243.79
Current Bal: 243.79
Comm Rate: 50.000%
Costs: 0.00
Ck Chg/Fee: 25.00
Penalty 243.79
Interest Rate: 0.000%
Interest Amt: 0.00
Date Received: 09/25/97

Status: 49 CLOSED PER ATTY
Coll Unit: 345 LORI BROWN
Date Last: 05/24/01
Activity Code: NU NOT USED

PLAINTIFF'S EXHIBIT for G ID. 9/5/03 RM

SSN

Prev GWA ID 01-0349
Old GWA Stgy 225

=====================================================================

=====================================================================

PAYMENTS

| --Date-- | Amount | Code | Rate |
|---|---|---|---|
| 09/25/97 | 0.00 | 97 | |

TRANSACTIONS

| --DATE-- | TIME | AC/RC | ----COMMENT---- | ID |
|---|---|---|---|---|
| 07/10/01 | 07:40 | TA/349 | | PWW |
| 08/02/01 | 15:01 | PS/NI | | SYS |
| 11/21/01 | 15:53 | SN/3 | | ROO |
| 11/23/01 | 07:39 | DT/GI | A1-45 THIRD ST | SYS |
| 11/23/01 | 07:39 | DT/GI | ADDRESS 2 | SYS |
| 11/23/01 | 07:39 | DT/GI | HP-0 | SYS |
| 11/23/01 | 07:39 | DT/GI | | SYS |
| 11/26/01 | 18:07 | TR/RP | | 618 |
| 11/26/01 | 18:07 | CC/CC | | 618 |
| DBTR REFUSING TO PAY 618 | | | | |
| 01/16/02 | 22:41 | TA/749 | | DMP |
| 05/30/02 | 14:47 | TA/450 | | ROO |
| 06/05/02 | 20:28 | TR/DA | | DLR |
| 06/06/02 | 19:39 | TR/DA | | DLR |
| 06/08/02 | 14:17 | TR/DA | | DLR |
| 06/09/02 | 16:51 | TR/DA | | DLR |
| 06/11/02 | 19:34 | TR/DA | | DLR |
| 06/12/02 | 19:00 | TR/DA | | DLR |
| 06/15/02 | 08:46 | TR/DA | | DLR |
| 06/18/02 | 12:52 | TA/450 | | ROO |
| 06/18/02 | 18:13 | TR/DA | | DLR |

83 . GOINS, EVELINE J Page 2

| -Date-- | Amount | Code | Rate | --DATE-- | TIME | AC/RC | ----COMMENT---- | ID |
|---|---|---|---|---|---|---|---|---|
| | | | | 06/19/02 | 17:53 | TR/DA | | DLR |
| | | | | 06/20/02 | 14:13 | TR/DA | | DLR |
| | | | | 06/21/02 | 14:00 | TR/DA | | DLR |
| | | | | 06/22/02 | 10:10 | TR/DA | | DLR |
| | | | | 06/23/02 | 13:16 | TR/DA | | DLR |
| | | | | 06/24/02 | 11:02 | CS/31 | | MB |
| | | | | 06/24/02 | 11:16 | CC/CC | MERGE FROM 765937 | DMP |
| | | | | 06/24/02 | 11:16 | CC/CC | MERGE FROM A26044 | DMP |
| | | | | 06/24/02 | 11:16 | CC/CC | UNRTRN WSU 1-4948180-297 | DMP |
| | | | | 06/24/02 | 11:16 | CC/CC | UNRTRN WSU 1-4953051-189 | DMP |
| | | | | 06/24/02 | 11:16 | CC/CC | UNRTRN BOB 1-4948180 | DMP |
| | | | | 06/24/02 | 11:16 | CC/CC | UNRTRN BOB 1-4948180 | DMP |
| | | | | 06/24/02 | 11:16 | CC/CC | UNRTRN BOB 1-4948180 | DMP |
| | | | | 06/24/02 | 11:16 | CC/CC | UNRTRN KAY 1-4948180-285 | DMP |
| | | | | 06/24/02 | 11:16 | CC/CC | UNRTRN FTA 1-4948180-234 | DMP |
| | | | | 06/24/02 | 11:16 | CC/CC | UNRTRN CVS 1-4948180-200 | DMP |
| | | | | 06/24/02 | 11:16 | CC/CC | UNRTRN CVS 1-4948180-283 | DMP |
| | | | | 06/24/02 | 11:16 | CC/CC | UNRTRN CVS 1-4948180-289 | DMP |
| | | | | 06/24/02 | 11:16 | CC/CC | UNRTRN CVS 1-4948180-280 | DMP |
| | | | | 06/24/02 | 11:16 | CC/CC | UNRTRN CVS 1-4948180-290 | DMP |
| | | | | 06/24/02 | 11:16 | CC/CC | UNRTRN CVS 1-4948180-187 | DMP |
| | | | | 06/24/02 | 11:16 | CC/CC | UNRTRN CVS 1-4948180-291 | DMP |
| | | | | 06/24/02 | 11:16 | CC/CC | UNRTRN CVS 1-4948180-227 | DMP |
| | | | | 06/24/02 | 11:16 | CC/CC | UNRTRN MRL-X 1-4948180 | DMP |
| | | | | 06/24/02 | 11:16 | CC/CC | UNRTRN MRL-X 1-4948180 | DMP |
| | | | | 06/24/02 | 11:16 | CC/CC | UNRTRN MRL-X 1-4948180 | DMP |
| | | | | 06/24/02 | 11:16 | CC/CC | UNRTRN MRL-X 1-4948180 | DMP |
| | | | | 06/24/02 | 11:16 | CC/CC | UNRTRN MRL-X 1-4948180 | DMP |
| | | | | 06/24/02 | 11:16 | CC/CC | UNRTRN MRL-X 1-4948180 | DMP |
| | | | | 06/24/02 | 11:16 | CC/CC | UNRTRN MRL-X 1-4953459 | DMP |

:83 GOINS, EVELINE J

| ----------PAYMENTS---------- | | | | ------------TRANSACTIONS------------ | | | | |
|---|---|---|---|---|---|---|---|---|
| --Date-- | Amount | Code | Rate | --DATE-- | TIME | AC/RC | ----COMMENT---- | ID |
| | | | | 06/24/02 | 11:16 | CC/CC | | DMP |
| | | | | UNRTRN | CVS | 1-4948180-237 | | |
| | | | | 06/24/02 | 11:16 | CC/CC | | DMP |
| | | | | UNRTRN | TOYS | 1-628737 | | |
| | | | | 06/24/02 | 11:16 | CC/CC | | DMP |
| | | | | UNRTRN | TOYS | 1-628737 | | |

Date Printed: Sep 18, 2002

3. Identify all your personnel involved in reviewing or drafting the form of letters sent in conjunction with the collection of plaintiff's alleged debt.

**ANSWER: Jack Boyajian and Marv Brandon.**

4. Identify all Connecticut attorneys to whom you have forwarded individual debts for collection in and after 1998.

**ANSWER: Joel M. Jolles, Esq., 45 Court Street, New Haven, CT 06511**
**Kantrovitz & Brownstein, P.C., 1764 Litchfield Turnpike,**
**P.O Drawer 3557, New Haven, CT 06525.**

5. Identify all FDCPA lawsuits to which you have been a party in and since 1998, including lawsuits under the JBC name ending in "Inc."

8. Identify all persons employed by JBC & Associates, P.C. at its New Jersey office during November 2001.

**ANSWER: None located in that office.**

9. Identify all persons employed by JBC & Associates, P.C. at its New York office during November 2001.

**ANSWER: None located in that office.**

10. Identify all persons employed by JBC & Associates, P.C. at its California office during November 2001.

**ANSWER: None located in that office.**

VERIFICATION

This is to verify that I have read the foregoing responses and that they true to the best of my knowledge.

JACK BOVAJIAN

Notary Public:
My Commission Expires

KAREN HOPKINS
NOTARY PUBLIC OF NEW JERSEY
Commission Expires 12/18/2005

**CERTIFICATION**

This is to certify that a copy of the foregoing has been mailed, postage prepaid, this 17th day of February 2004, to:

Joanne S. Faulkner, Esq.
123 Avon Street
New Haven, CT 06511

Sabato P. Fiano