United States District Court
District of Connecticut
FILED at NEW HAVEN
2/17/04
By [signature]
Deputy Clerk

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| EVELINE GOINS | : | CIVIL ACTION NO. |
| | : | 3:02 CV 1069 (MRK) |
| | : | |
| | : | |
| vs. | : | |
| | : | |
| | : | |
| JBC & ASSOCIATES, P.C. | : | |
| JACK H. BOYAJIAN | : | |
| MARVIN BRANDON | : | FEBRUARY 17, 2004 |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

**Preliminary Statement**

The Plaintiff asserts this action pursuant to the Fair Debt Collection Practices Act ("FDCPA") and various consumer-related state statutes against an out-of-state law firm, JBC & Associates, Inc. ("JBC") and two attorneys, Jack Boyajian ("Boyajian") and Marvin Brandon ("Brandon"), employed by JBC. Plaintiff bases her action entirely upon a single letter dated November 22, 2001, which she allegedly received from JBC regarding certain dishonored checks written by the Plaintiff and placed with JBC for collection. The letter asserted a claim against the Plaintiff in an amount of $1971.80, or requested that the Plaintiff otherwise respond to JBC if she had any information relieving her of the obligation. Plaintiff never responded to JBC disputing that she had actually written the bad checks at issue.

As the basis of her FDCPA claim, Plaintiff argues that the November 22, 2001 letter was false and misleading. More specifically, Plaintiff contends that there was no basis for the

1

$1971.80 amount sought in the letter. Plaintiff ignores, however, that the November 22, 2001 letter was the *third* letter in a series of collection letters received by the Plaintiff with respect to the dishonored checks at issue. In fact, the November 22nd letter expressly refers to a prior letter by JBC to the Plaintiff offering the Plaintiff the opportunity to voluntarily make restitution for the dishonored checks. As the defendant Boyajian explained at his deposition, these prior letters sent by JBC would have delineated the creditor, check number, amount and date of each check sought to be collected upon, as well any service charges and statutory damages that potentially could be included in any claim on the checks.

Nowhere in her Motion, including in her sworn affidavit, does the Plaintiff represent that the November 22, 2001 letter was the first or only letter that she received from JBC.[1] Plaintiff does not in any way challenge or seek to explain the express reference in the November 22nd letter to prior communications between the parties. Accordingly, there are clear questions of fact as to the substance of any prior communications between the parties and the context within which $1971.80 claim set forth in the November 22nd letter was made. Plaintiff cannot prove her claims as a matter of law based solely on the contents of this third letter, plucked out of context and separated from the collective and related series of communications within which it was sent.

Plaintiff's further arguments in support of her Motion are unavailing. In many instances, Plaintiff proffers an unreasonable, hyper-technical reading of the letter to create "threats" where

---

[1] Rather, Plaintiff's counsel has artfully represented to the Court that Plaintiff "does not intend at trial to rely on any other written communications between the parties." (See Endorsement and Scheduling Order dated January 6, 2004; Dkt. No. 43).

there are none.  In other instances, Plaintiff simply misstates the legal rights of JBC to collect the

debt.  In any event, the Plaintiff's motion must be denied.

## STATEMENT OF FACTS

On dates from January 25, 1996 through January 29, 1996, the Plaintiff wrote

approximately twenty-eight (28) bad checks in an aggregate sum of thousands of dollars.[2]  The

checks were made payable to various, similarly owned retailers who forwarded the debts to JBC,

a law firm, for collection.  Among the bad checks written by the Plaintiff were two (2) checks

made payable to Wilson Suede & Leather ("Wilson") in respective face amounts of $243.79 and

$158.99, and two (2) checks made payable to Bob's Stores ("Bob's") in the respective face

amounts of $178.95 and $354.17.  (See Deposition Transcript of Jack Boyajian, pp. 61-62).

Both Wilson and Bob's were owned by or affiliated with JBC's primary client, an entity known

as Melville Corporation.  (Id.)  Accordingly, at some point the Plaintiff's numerous bad checks,

including the aforementioned four (4) checks, were merged by JBC under a master file.  (Id.)

At various points prior to November 22, 2001, JBC sent the Plaintiff two letters

concerning the aforementioned four checks.[3]  (Id. at pp. 70-78, 90-91).  The form used by JBC

for the initial letter delineated for the Plaintiff the number, amount and date of each of the four

checks, as well referencing any service charges and statutory damages that potentially could be

---

[2] Plaintiff does not dispute in her Motion that she wrote bad checks.
[3] As a general practice, JBC does not maintain hard copies of the actual letters sent to debtors in view of the voluminous amount of letters sent.  Rather, JBC relies on its internal, computer-recorded account notes to record communications with debtors.

included in any claim on the checks, including but not limited to any damages for dishonored checks provided for by Connecticut General Statutes Section 52-565a. [4] (Id.).

On or about November 22, 2001, JBC followed up its two prior letters with a third letter to the Plaintiff. The letter is reflected in JBC's internal, computer-recorded account notes as "SN/3", signifying that it was the third letter sent with respect to the account at issue. (See Exhibit E to Deposition of Marvin Brandon). At no time did the Plaintiff respond to JBC's communications by disputing that she had not written the bad checks or by providing JBC with any documentation disputing the debt.

At all relevant times, including at or about the time that it sent the November 22nd letter to the Plaintiff, JBC was able, willing and had the authority of its client to refer uncollected accounts to attorneys in other states to pursue civil and criminal proceedings against debtors. (Id. at pp. 87-88). In this regard, JBC has in fact referred uncollected accounts to Connecticut attorneys to pursue civil and criminal proceedings against debtors in this state. (Id.); (See Defendants' response to interrogatory no. 4).

## ARGUMENT

### I.    THE STANDARDS GOVERNING SUMMARY JUDGMENT

The general law concerning motions for summary judgment is well settled. Summary judgment will be granted when "the pleadings, depositions, answers to interrogatories, and

---

[4] Connecticut General Statutes Section 52-565a(d) provides, in pertinent part, for statutory damages "in an amount to be determined by the court in light of the circumstances, but in no event shall such amount be greater than the face amount of the check or four hundred dollars, whichever is less."

4

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Federal Rule Civil Procedure 56(c); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party carries the initial burden of demonstrating an absence of a genuine issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L. Ed.2d 265 (1986). The facts and related inferences must be viewed in a light most favorable to the non-moving party. <u>Matsushita Electric Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L. Ed.2d 538 (1986).

The court will not grant a motion for summary judgment unless "the fact as to which there is no issue warrant judgment for the moving party as a matter of law." <u>Cronin v. Aetna Life Insurance Company</u>, 46 F.3d 196, 202 (2d Cir. 1995). Where the plaintiff bears the burden of proof at trial, the defendant may satisfy its obligation in moving for summary judgment by pointing out an absence of evidence to support an essential element of the plaintiff's case. <u>Ginsberg v. Healey Car and Truck Leasing, Inc.</u>, 189 F.3d 268, 271 (2d Cir. 1999); <u>La-Bounty v. Coughlin</u>, 137 F.3d 68, 72 (2d Cir. 1998). A party may not rely on the mere arguments of counsel to carry its burden on summary judgment. <u>E.g.</u>, <u>Leggien v. Mealo</u>, 484 F. Supp. 719 (E.D. Pa. 1980) [statements of counsel not cognizable]; <u>Baker v. Chatham</u>, 939 F. Supp. 782 (D. Haw. 1996). [legal memoranda and oral argument are not evidence]; see also <u>Countryside Oil Co. v. Travelers Ins. Co.</u>, 928 F. Supp. 474 (D.N.J. 1995) [unauthenticated documents may not be relied on].

## II.    THE FDCPA

### A.    The FDCPA Does Not Prohibit Reasonable, Ethical Debt Collection Activity.

The FDCPA is based on the fundamental premise that "every individual, whether or not he owes [a] debt, has a right to be treated in a reasonable and civil manner." <u>Cirkot v. Diversified Financial Systems, Inc.</u>, 839 F. 941, 944 (D. Conn. 1993)[referring to the remarks of Representative Frank Annunzio, 123 Cong. Rec. 10241(1977)]. JBC does not contest this principle, but notes that the FDCPA must also leave room for legitimate, ethical debt collection activity. The purpose of the FDCPA is to protect consumers from unfair, deceptive and harassing debt collection practices, while leaving collectors <u>free to employ efficient, reasonable and ethical practices</u> in pursuit of their profession. <u>Graziano v. Harrison,</u> 763 F. Supp. 1269 (D. N. J.), modified on other grounds, 950 F.2d 107 (3rd Cir. 1991) (emphasis added); <u>Johnson v. NCB Collections, Inc.,</u> 799 F. Supp. 1298 (D. Conn. 1992); <u>Beattie v. DM Collections, Inc.</u>, 754 F. Supp. 383 (D. Del. 1991) [FDCPA does not preclude nonabusive statements to encourage payment.]

Claims under the FDCPA are evaluated under the "least sophisticated consumer" standard. <u>Clomon v. Jackson</u> 988 F.2d 1314, 1318 (2d Cir. 1993). However, not all collection efforts violate the rights of the least sophisticated consumer. "Even the 'least sophisticated consumer' can be presumed to possess a rudimentary amount of information about the world and a willingness to read a collection notice with some care." <u>Id</u>. "Courts ordinarily incorporate an element of reasonableness into even the 'least sophisticated debtor.' " <u>Id</u>. at 1319-20. The

6

FDCPA does not extend to every bizarre or idiosyncratic interpretation by a debtor. <u>Rosa v. Gaynor</u>, 784 F. Supp. 1, 7 (D. Conn. 1989).

In order for the FDCPA to attain its intended purposes, courts must strike a balance between providing protection to consumers from improper and offensive collection tactics and allowing the collection industry, in a reasonable and efficient manner, to perform its essential function in our economy. Debt collectors should not be subject to litigation merely because their task is to collect a debt. Accordingly, courts should construe the FDCPA mindful of its legitimate purposes, and aware of its potential abuses. <u>See</u>, <u>e.g.</u>, <u>Lindbergh v. Transworld Systems, Inc.</u>, 846 F. Supp. 175, 180 (D. Conn. 1994) (Cabranes, J.) [The Court rejected an argument under the FDCPA because it reflected "a false, narrow and overly mechanical reading of the FDCPA."]. The FDCPA is not designed to enable consumers to eliminate the legitimate but adverse consequences of non-payment of debt. See <u>Catherman v. Credit Bureau of Greater Harrisburg</u>, 634 F. Supp. 693 (E.D. Pa. 1986); <u>Wright v. Credit Bureau of Georgia</u>, 555 F. Supp. 1005 (N.D. Ga. 1983) [fact recognized by all consumers is that a failure to pay one's bills will affect ability to obtain credit in the future].

III.  **PLAINTIFF HAS FAILED TO ESTABLISH HER BURDEN OF SHOWING THAT SHE IS ENTITLED TO JUDGMENT AS A MATTER OF LAW.**

A.  **Plaintiff Cannot Establish As A Matter Of Law That The $1971.80 Claimed In The November 22nd Letter Was False Or Misleading In View Of Plaintiff's Complete Failure To Address The Parties' Prior Communications In Her Motion.**

The Plaintiff seeks judgment as a matter of law by blatantly providing this Court with only half the story. The November 22, 2001 letter was the *third* letter in a series of collection

letters received by the Plaintiff with respect to the dishonored checks at issue. JBC's initial letter to the Plaintiff sought to collect upon a total of four (4) checks, two of which were made payable to Wilson in the respective amounts of $243.79 and $158.99, and two of which were made payable to Bob's in the respective amounts of $178.95 and $354.17. Plaintiff, however, has not introduced any evidence as to her prior communications with JBC. Accordingly, there are clear questions of fact as to what checks the November 22nd letter was referring to, the amount of those checks or how the amount claimed was calculated in view of the parties' prior communications. In the absence of a complete record as to the communications of the parties, the Plaintiff cannot establish as a matter of law that the amounts claimed in this third letter were false or misleading.

Plaintiff mistakenly asserts that any calculation of her bad checks could not have possibly included a claim for statutory damages pursuant to Connecticut General Statutes Section 52-265a. because a creditor is first required to "go to court" before making such a claim. (See Pl. Mem. in Supp. Of Mot. For Summ. Judg. At p. 4). Such an assertion stands the entire notion of pre-litigation debt collection on its head. According to the Plaintiff, a creditor presumably can never assert a pre-litigation demand that includes damages that may ultimately be awarded by a court, whether those damages are in the form of punitive damages or, in this case, statutory damages. Plaintiff, however, fails to cite to any legal authority supporting such a sweeping assertion. There is no basis for the Plaintiff's contention that JBC was somehow limited from pursuing its creditor client's full claim, including any statutory damages provided by law, without first commencing litigation.

8

**B.    Defendant's Mere Mention of Civil Or Criminal Proceedings Was Not Improper.**

In further support of her Motion, Plaintiff contends that JBC's letter violated the FDCPA as a matter of law solely because it referenced "civil or criminal proceedings." Simply stated, there was nothing false, misleading or deceptive about JBC's mention of such proceedings.

**1.    JBC's letter did not threaten the Plaintiff in any way.**

Aside from any issues of fact as to JBC's right to have civil or criminal proceedings commenced against the Plaintiff, it must be noted that nowhere in the November 22nd letter did JBC ever "threaten" such civil or criminal proceedings or represent that it in fact had any intent to pursue such proceedings. Rather, JBC invited the Plaintiff to provide "sufficient documentation that relieve[d] [her] of th[e] obligation." In the event that the Plaintiff provided any such information, JBC merely "reserve[d] the right to use any and all information [it] obtained [from the Plaintiff] in further civil or criminal proceedings."

Plaintiff's writing of bad checks did in fact have both civil and criminal consequences. Plaintiff was susceptible to a civil claim pursuant to Connecticut General Statutes Section 52-265a. Plaintiff was potentially subject to prosecution pursuant to Connecticut General Statutes Section 53a-128. Accordingly, at a minimum, future civil or criminal proceedings against the Plaintiff were at least theoretically possible. JBC's letter merely provided the Plaintiff with the benefit of a forthright, express warning that any information she disclosed to JBC could possibly be used against her in potential future proceedings.

**2.    JBC was able and willing to assert the creditor's right to commence civil or criminal proceedings against the Plaintiff.**

Plaintiff again seeks to stand all pre-litigation debt collection on its head by arguing that JBC could not make any mention of civil or criminal proceedings unless the firm itself intended to commence such proceedings against the Plaintiff. (See Pl. Mem. in Supp. Of Mot. For Summ. Judg. At p. 5). In other words, Plaintiff argues that unless JBC intended to actually handle the litigation itself, it was precluded from mentioning the possible commencement of such proceedings in its letter. Plaintiff has not, nor can she, cite to any legal authority supporting such an unfounded premise.

Whether JBC intended to pursue possible civil or criminal proceedings against the Plaintiff at the time it sent her the November 22, 2001 letter is an inherent question of fact. Plaintiff offers virtually no evidence whatsoever in support of her extraordinary burden of showing, as a matter of law, that JBC had no intent of pursuing such civil or criminal proceedings. For that reason alone, her motion for summary judgment should be denied. In any event, JBC was at all relevant times able, willing to, and in fact did, refer uncollected accounts to Connecticut attorneys to pursue civil and criminal proceedings against debtors in this state.

Plaintiff offers a disingenuously selective reading of the defendant Brandon's deposition to baldly conclude that "[n]o civil proceedings were intended" by JBC against the Plaintiff. (See Pl. Mem. in Supp. Of Mot. For Summ. Judg. At p. 5). To the contrary, Brandon's testimony was that it was the decision of the defendant Boyajian, not Brandon's, to determine whether JBC would ultimately pursue civil or criminal proceedings against a debtor. (See Deposition

10

Transcript of Marvin Brandon, pp. 28-29). In this regard, Brandon merely testified that *he himself* did not have a personal intent to sue at the time JBC sent the letter to the Plaintiff. (Id.). Such testimony hardly constitutes evidence, as a matter of law, that JBC had no intent to pursue civil or criminal proceedings against the Plaintiff at the time the November 22nd letter was sent. Plaintiff's motion for summary judgment should be denied.

### 3. JBC was not precluded by any applicable statute of limitations from pursuing civil or criminal proceedings against the Plaintiff.

Plaintiff further argues that JBC's reference to civil or criminal proceedings was false and misleading because JBC was precluded by the applicable statute of limitations from any such proceedings against the Plaintiff. Plaintiff's argument is legally flawed. First, the parties agree that any civil claim against the Plaintiff regarding her writing of bad checks was governed by a six (6) year statute of limitations for contract actions. (See Pl. Mem. in Supp. Of Mot. For Summ. Judg. At p. 5). In this regard, JBC's letter of November 22, 2001 was undisputedly within six years of the Plaintiff's writing of bad checks in late January 1996. Accordingly, JBC was not barred by the statute of limitations from commencing civil proceedings against the Plaintiff at the time it sent the letter. To the extent that the Plaintiff argues that JBC did not have sufficient time to commence civil proceedings against the Plaintiff in the approximate two (2) months between the sending of its letter and any expiration of the statute of limitations, this is mere argument of counsel on which Plaintiff has offered no evidence, and is incorrect in any event.

11

To the extent that the applicable criminal statute of limitations for dishonored checks had, in fact, expired at the time of the November 22nd letter from JBC to the Plaintiff, JBC still could have pursued criminal proceedings against the Plaintiff. Connecticut law is clear that, in both civil and criminal proceedings, the applicable statute of limitations merely serves as an affirmative defense that must be raised by the defendant or else it is waived. "The statute of limitations is not a jurisdictional bar to prosecution; it is an affirmative defense, which must be raised and can be waived." State v. Middlebrook, 51 Conn.App. 711, 713 n. 4, 725 A.2d 351, cert. denied, 248 Conn. 910, 731 A.2d 310 (1999). Similarly, in civil proceedings, the "Statute of Limitations creates a defense to an action. *It does not erase the debt.*" (Emphasis added). Zapolski v. Sacks, 191 Conn. 194, 198 (1983) quoting Buckley v. Buckley, 144 Conn. 403, 411 (1957).

In this case, JBC was free to pursue the initiation of criminal proceedings against the Plaintiff at the time it sent her the letter dated November 22, 2001. The statute of limitations was *not* a jurisdictional bar to JBC seeking to refer the matter to prosecution. Had JBC pursued criminal proceedings, and had the Plaintiff been prosecuted, it would have been incumbent upon the Plaintiff to raise a statute of limitations defense. Accordingly, JBC's mention of criminal proceedings in its letter to the Plaintiff cannot be deemed to have been false and misleading as a matter of law.

12

**C.    Defendant Did Not Misrepresent The Law By Indicating That It Might Inquire As To The Plaintiff's Identity and Location From The State Motor Vehicle Department.**

In her Motion, the Plaintiff contends that JBC's letter violated the FCDPA as a matter of law by indicating that JBC might inquire as to the Plaintiff's identity and location from the Connecticut Department of Motor Vehicle ("DMV"). (See Pl. Mem. in Supp. Of Mot. For Summ. Judg. At p. 5-6). Plaintiff bases her argument on a complete misreading of federal and state law, from which Plaintiff mistakenly concludes that JBC was precluded from making any inquiry of the DMV.

First, the statutes on which plaintiff relies indicates that an individual may affirmatively consent to the release of information by DMV. 18 U.S.C. 2721 (d); Connecticut General Statutes Section 14-10 (d). The letter in question notes merely that Plaintiff "may" have done so. But even if the Plaintiff had not given broad advance consent through the license process, such information may still have been available to JBC.

Contrary to the Plaintiff's contentions, both federal and state law expressly permitted JBC, as the agent of its retailer clients, to verify the accuracy of the personal information submitted by the Plaintiff (i.e., her address, driver's license number) to retailers at the point of sale. 18 U.S.C. 2721 (3)(A); Connecticut General Statutes Section 14-10 (f)(B). Additionally, JBC was expressly entitled by both federal and state statute to verify the Plaintiff's voluntarily submitted driver's license number, offered to retailers at the time that she wrote *numerous* bad checks, in order to "investigat[e] in anticipation of litigation." 18 U.S.C. 2721 (4); C.G.S. Section 14-10 (f)(C).

13

It defies common sense that the retailers at issue would be precluded from verifying the Plaintiff's driver's license number and other identifying information, voluntarily submitted by the Plaintiff at the point of sale. Otherwise, there simply would be no purpose in the retailer requesting, and the Plaintiff providing, such information in the first instance. In fact, the practice of obtaining such information is specifically intended to provide retailers with a source of identification in the event of the precise harm at issue in this case – the writing of dishonored checks or other fraudulent conduct by the customer. Here, the Plaintiff seeks to benefit by her own misconduct. Plaintiff essentially contends that she is entitled to induce retailers to sell her goods by offering the required identifying information, only to later argue, *after she has defaulted on her obligations to them,* that they are not entitled to confirm the very information she voluntarily provided to them for their reliance. Plaintiff's position is contrary to law, common sense and fundamental fairness.

> **D.    Plaintiff Is Not Entitled To Summary Judgment On Her CUTPA Claim Because She Has Admittedly Suffered No Ascertainable Loss Within The Meaning Of The Act.**

Based on the representations of the Plaintiff, this Court has unequivocally ordered that the Plaintiff has suffered no actual damages of any kind in this action. (See Endorsement and Scheduling Order dated January 6, 2004; Dkt. No. 43). The law is clear that, under such circumstances, the Plaintiff cannot sustain a claim under the Connecticut Unfair Trade Practices Act, Connecticut General Statutes Section 42-110b *et seq.* ("CUTPA" or "the Act").

Section 42- 110g (a) expressly limits the right to bring a CUTPA action to "[a]ny person who suffers any *ascertainable loss of money or property* … as a result of the use or employment

14

of a method, act or practice prohibited by section 42-110b...." (Emphasis added).  To the extent that an individual suffers such an ascertainable loss, he or she *"may bring an action ... to recover actual damages"* C.G.S. Section 42- 110g (a) (Emphasis added).

Consistent with the express language of the Act, the Connecticut courts have uniformly held that "[t]he ascertainable loss requirement is a threshold barrier which limits the class of persons who may bring a CUTPA action seeking either actual damages or equitable relief." Hinchliffe v. American Motors Corp., 184 Conn. 607, 615, 440 A.2d 810 (1981).  Thus, to be entitled to *any* relief under CUTPA, a plaintiff must first prove that he has suffered such a loss due to a CUTPA violation.  Id.; Gargano v. Heyman, 203 Conn. 616 (1987).  For purposes of CUTPA, "[a]n ascertainable loss is a deprivation, detriment, [or] injury that is capable of being discovered, observed or established." (Internal quotation marks omitted.) Service Road Corp. v. Quinn, 241 Conn. 630, 638, 698 A.2d 258 (1997).

In addition to her own admission that she has suffered no actual damages in this case, Plaintiff's pleadings, as well as her submissions in support of the instant motion, are devoid of any allegations of loss of money or property or any proof that such loss occurred.  In fact, under the facts of this case, it is inconceivable how any of her alleged violations would result in such a loss.  Plaintiff ignored the letters in question, made no payments and had her obligations discharged in bankruptcy.  Having suffered no ascertainable loss, the Plaintiff cannot sustain her CUTPA claim.

15

## CONCLUSION

For all the foregoing reasons, the Plaintiff's motion for summary judgment should be denied in its entirety.

THE DEFENDANTS,

By: _____
Jonathan D. Elliot (Ct 05762)
Sabato P. Fiano (Ct 18879)
Kleban & Samor, P.C.
2425 Post Road
Southport, CT 06890
(203) 254-8963

## CERTIFICATION

This is to certify that a copy of the foregoing has been mailed, postage prepaid, this 17th day of February 2004, to:

Joanne S. Faulkner, Esq.
123 Avon Street
New Haven, CT 06511

_____
Sabato P. Fiano

16